# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
July 1, 2015 Session

## HONEY BUNCH v. B.F. BUNCH

**Appeal from the Chancery Court for Anderson County**
**No. 12CH4776      William E. Lantrip, Chancellor**

---

**No. E2014-02121-COA-R3-CV-FILED-OCTOBER 15, 2015**

---

Honey Bunch ("Plaintiff") filed suit seeking partition by sale of a parcel of real property located in Anderson County, Tennessee. B.F. Bunch ("Defendant") filed a counterclaim alleging, in pertinent part, that a quit claim deed of a portion of the property was void for lack of capacity, undue influence, or fraud, and that the property at issue should be partitioned in kind. After a trial, the Chancery Court for Anderson County ("the Trial Court") found and held, *inter alia*, that the quit claim deed was valid and that the remaining property should be partitioned by sale. Defendant appeals raising issues regarding whether the Trial Court erred in finding the quit claim deed valid, whether the Trial Court erred in finding that the property should be partitioned by sale, and whether the Trial Court erred in prohibiting Defendant from using a common driveway. We find and hold that the evidence in the record on appeal does not preponderate against the Trial Court's findings, and we find no error by the Trial Court. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J. M.S. and JOHN W. MCCLARTY, J., joined.

David A. Stuart, Clinton, Tennessee, for the appellant, B.F. Bunch.

Robert W. Wilkinson, Oak Ridge, Tennessee, for the appellee, Honey Bunch.

# OPINION

## Background

Plaintiff and Defendant are brother and sister and the adult children of Belzie Bunch and Mary F. Bunch. During their lifetime, Belzie Bunch and Mary F. Bunch jointly owned real property consisting of approximately 35 acres located in Anderson County, Tennessee. Belzie Bunch died in 1993. In 1994, Mary F. Bunch ("Mother") conveyed a portion of her real property by quit claim deed ("Quit Claim Deed") jointly to herself and Plaintiff with right of survivorship. The portion of the property owned by Mother and not conveyed in the Quit Claim Deed consists of approximately 17 acres ("17 Acre Parcel"). Defendant has lived on the 17 Acre Parcel for approximately forty-four years. Mother died in January of 2010.

Plaintiff filed this suit in November of 2012 seeking partition by sale of the 17 Acre Parcel. Defendant filed an answer and counter-claim alleging, in pertinent part, that the Quit Claim Deed should be held void for lack of capacity, undue influence, or fraud, and that the entire 35 acre tract once owned by Belzie Bunch and Mary F. Bunch could and should be partitioned in kind. The case proceeded to trial without a jury in July of 2013.

Plaintiff testified at trial that she does not believe that the 17 Acre Parcel can be divided in kind. She stated that the property was "all trashed up, I have pictures that are just not even possible for somebody to be interested in purchasing it."

Plaintiff testified that Mother died in January of 2010 at the age of 84. Mother had a high school diploma. Plaintiff testified that in 1994, the year the Quit Claim Deed was executed, Mother scheduled her own cataract surgery and conducted her own business, but she did not drive. Mother cooked for herself and paid her own bills. Plaintiff testified that Mother relied on several people to drive her places including Plaintiff, Defendant's now ex-wife, and Plaintiff's cousin. When people would take Mother to the grocery store, Mother did her own shopping. Plaintiff testified that Mother would not have followed any advice Plaintiff gave her if it went against Mother's own will.

Plaintiff was asked what she was doing for Mother in 1994, and she stated:

Basically, just going and taking her to the grocery store. And if she had doctors' appointments like a physical I would take her to the doctor's appointment. And we would go when she wanted to go out and eat. And also she watched my son for me for a period. She actually would come and live with me because in the wintertime she had like . . . she didn't have

2

good heating, she just had a stove and a lot of times she just didn't want to get out there and round up wood or coal so she would actually stay with me for months at a time.

Plaintiff was asked if other people helped Mother during 1994, and she stated:

Yes. Well, she relied heavily on my cousin, Joan Foust. And her daughter as her daughter got holder [sic] she would take her, Kim Foust would take her to places. And they did quite a bit of running around because I worked full time so I couldn't go and just hang out and go grocery shopping and shopping.

Plaintiff testified that making the Quit Claim Deed was Mother's idea. Plaintiff stated:

Well, my mother wanted me to . . . because she knew she didn't drive, she never drove, she wanted me to be able to live down there on the property so that I could instead of coming all the way from Knoxville all the way down to take her she wanted me there. And I wanted to be there because I paid house payments my whole time and it would have been nice to have been down there.

Plaintiff testified that Mother requested that Plaintiff contact Attorney Jean Munroe about preparing the deed. Plaintiff took Mother to meet with Ms. Munroe. When asked about discussions that took place when Mother met with Ms. Munroe, Plaintiff stated that she did not "remember really anything about that day [in 1994] . . . ." Plaintiff admitted that she had worked for Ms. Munroe, but did not believe that she was working for Ms. Munroe at the time the Quit Claim Deed was prepared and executed.

In 1999, Mother transferred approximately one acre of her remaining property to her grandson, Defendant's son. Ms. Munroe prepared the deed from Mother to Mother and this grandson jointly. Plaintiff testified that she had nothing to do with the deed from Mother to grandson.

Plaintiff's father died approximately a year and a half before Mother made the Quit Claim Deed. Plaintiff was asked if her parents had expressed that they planned to divide their property equally between Plaintiff and Defendant, and she stated:

Years ago, yes. . . . Well, that's true but my mother changed her mind on a lot of things because of [Defendant's] situation, how he owed like thirty thousand dollars back child support. . . . Also, he was married three times

and each time was . . . the first two he beat on those women, I have a picture, I don't have it with me but one where she had a black eye. And she divorced him. And the other one was married to him and has three children by him and he beat her up. And anyway, he has been a very abusive person, controlling and a bully pretty much his whole life. And the person that he was married to for fifteen years; my mother did not want this person getting this property, any of it. And he married her I think somewhere in the '94, '96 something like that and they didn't divorce until like October, 2011. And that was my mother's concern. She didn't want the state to take it and she didn't want this woman to have part of it. And she just knew he would lose it because he is not responsible, he doesn't pay for things. He's lived off her basically those 40 years. He had his water and electricity runing from her house down to his and she would pay the bill.

Teresa Ann Hale testified that she and Plaintiff worked together beginning in 1989, and they became friends. Ms. Hale also got to know Mother. Ms. Hale stated that she and Mother "were good friends. We talked a lot. Maybe two or three times a week. If I didn't call her she would call me." Ms. Hale sometimes drove Mother to the grocery store.

Ms. Hale was asked if Mother seemed competent, and she stated: "Yes, she was sharp as a tack. . . . She did everything for herself, she cooked for herself. She did pretty much around her house what she wanted to do. And she talked to me with utmost confidence, she was very confident in her conversations." Ms. Hale testified that Mother paid her own bills and "walked to the mailbox and got her mail out and if she had anything to mail she would mail it herself." Ms. Hale stated that Mother "resented" being told what to do and that Mother was capable of making up her own mind. Ms. Hale stated: "nobody dictated anything to [Mother]." Ms. Hale testified that Mother had conversations with her about making the deed to Plaintiff and the deed to her grandson, and Ms. Hale believed that Mother understood what she was doing.

Defendant testified that Mother had been hospitalized for psychiatric care when Defendant and Plaintiff were children. Plaintiff was asked if Mother had undergone electro-convulsive therapy, and she stated: "She said she did." The last time Mother was hospitalized was probably in the 1960s. Defendant was asked about Mother's mental condition during the 1990s, and he stated:

Well, I had my sons living with them during that time. My older son lived with them and basically they done the cooking and helping her. And then

4

my second son moved in with her after they had moved out for a little while so they were there to cook for her. And the last until my wife and me split up my wife cooked her supper every night and took it up there to her.

Defendant testified that he picked up Mother's prescriptions at the pharmacy for her. Defendant testified that he brought Mother "breakfast from Hardee's every other morning and [saw] what she needed at night . . . ." Defendant testified that during the winter time he would sit up at night to keep a fire going for Mother. He stated: "I had to keep her fire because she got to where she couldn't throw the wood in the fire." Defendant testified that Mother only stayed with Plaintiff during the winter when Plaintiff's son was young and Mother was needed to babysit. Defendant testified that Plaintiff would not go to Mother's home every time Mother wanted Plaintiff to do so.

After trial, the Trial Court entered its order on August 6, 2013 finding and holding, *inter alia*:

3. At the time the property was conveyed by [Mother] to [Mother] and [Plaintiff], [Mother] was capable of executing the deed. She did so knowingly and competently. She was not operating under undue influence. The Court finds that the only confidential relationship that existed between [Mother] and her daughter, [Plaintiff], was a typical mother-daughter relationship.

4. The Court, therefore, ORDERS that the Counter-Complaint filed in behalf of the Defendant seeking to void the 1994 conveyance is overruled. The Court finds and, therefore, ORDERS that the evidence preponderates against any suggestion that the conveyance was effectuated as a result of undue influence of the Plaintiff over [Mother].

5. The Court further finds that the action seeking partition is supported by the evidence. The Court ORDERS that the 17.8 acres referred to in the Plaintiff's Complaint should be divided equally between the Plaintiff and the Defendant. The Court, however, finds that evidence is lacking regarding the issue as to whether or not this property is capable of being divided in kind. The Court, therefore, ORDERS that commissioners be appointed to determine if the property can be divided in kind and, if so, how. The Court suggests that the parties agree on the designation of a surveyor and one (1) or two (2) realtors to comprise the commissioners necessary to make the determination with respect to the property and that the commissioners report back to this Court with their findings.

After further hearing the Trial Court entered its order on December 10, 2013 finding and holding, *inter alia*:

the Court finds that the subject property is property that can be divided in kind, but the parties need to agree which party will receive which parcel. The parties shall have 30 days within which to decide how to divide the two (2) parcels. If the parties are unable to divide parcels, the Court will order the property sold and the proceeds divided between the parties based on the laws of the State of Tennessee.

Defendant filed a Motion for New Trial, to Alter or Amend Judgment and/or to Make Additional Findings of Fact and Conclusions of Law. In his motion Defendant stated, among other things:

To the extent the driveway to the defendant's residence may be an issue, this Court should hear evidence to determine its status. It has been in use for a period in excess of 20 years, during which time it has been maintained by defendant, and most of it is located on the tract where the defendant's residence is located. Any other portion of the roadway constitutes a prescriptive easement and it works no injury upon the property for the driveway to continue to be utilized in the same manner as it has for many years in the past.

After a hearing the Trial Court entered its order on February 10, 2014 finding and holding:

This cause came to be heard . . . upon the Motion for New Trial, to Alter or Amend Judgment, and/or Make Additional Findings of Fact and Conclusions of Law filed in behalf of [Defendant], the testimony of witnesses, the argument of counsel, and the record as a whole from all of which the Court finds that it may be appropriate to divide the subject property into two (2) parcels rather than forcing a sale of the said property. The property can be divided into two (2) parcels, one of which contains a little over six (6) acres and the other of which contains a little over eleven (11) acres. [Defendant] currently resides on the six (6) acre tract, but he lives in a dwelling that was formerly a tool shed which he has renovated into a residence. Apparently he at one time occupied a mobile home and the tool shed was built as an attachment to the mobile home. The mobile home has since been removed, yet [Defendant] continues to reside in that portion which remains. The Court is concerned that the property constitutes an eyesore as a result of the dilapidated condition of the

6

buildings and the substantial amount of trash, debris, refuse, and litter strewn about the said property. [Defendant] would like the Court to award to him the six (6) acre tract, but [Plaintiff] has asked that this same property be awarded to her. [Plaintiff] argues that the condition of the property which is currently occupied by [Defendant] is such that it is impossible for her to sell the property that she owns which is adjacent to his.

The Court is inclined to grant the six (6) acre tract to [Defendant], but will do so provided certain conditions are met. First, [Defendant] will have 90 days to remove all of the debris, trash, refuse, and litter strewn about the property. [Defendant] shall be enjoined and permanently restrained from bringing onto the property any additional trash, debris, refuse, or litter. Second, [Defendant] shall not utilize any portion of the property which currently belongs to [Plaintiff] to access his property. [Defendant] currently gains access to the six (6) acre tract by coming across a driveway, a portion of which is on property that belongs to [Plaintiff]. [Defendant] is enjoined and permanently restrained from coming across [Plaintiff's] property for any reason whatsoever effective immediately.

The parties, through counsel, have stipulated and the Court so ORDERS that if [Defendant] fails to abide by the conditions as herein set forth then the property shall be sold pursuant to [Plaintiff's] request. [Defendant] shall have 90 days within which to remove all of the trash, debris, refuse, and litter failing which the Court will order the property sold. [Defendant] shall not cross over or come upon [Plaintiff's] property which is adjacent to the six (6) acre tract for any purpose whatsoever and should he do so the subject property shall be sold.

The parties are directed to return to Court 90 days hence and advise the Court as to whether or not [Defendant] has met the conditions set forth herein. If all of the conditions herein are met, the Court will consider awarding the six (6) acre tract to [Defendant] and the eleven (11) acre tract to [Plaintiff]. If the conditions have not been met and based on the stipulation of the parties, the property shall be ordered sold.

All other matters are reserved.

After further hearing the Trial Court entered its order on May 23, 2014 finding and holding, *inter alia*:

> This cause came to be heard . . . from the directive issued in this Court's previous Order which ordered the parties to return 90 days after the last hearing and advise the Court as to whether or not [Defendant] had met the conditions set forth in that Order requiring him to remove all of the debris, trash, refuse, and litter strewn about the six (6) acre tract where he currently resides. Defendant interposed an objection that Plaintiff failed to disclose her intention to argue that Defendant had not complied with the Court's previous Order. The Court overruled Defendant's objection. After hearing the evidence and the testimony of the parties, the Court finds that there has not been a substantial compliance with the Court's previous Order. The Court finds that the offensive materials remain on the six (6) acre tract making the adjoining property virtually worthless and that the only recourse is for the property to be sold and the proceeds divided.
>
> IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED that the parties' jointly owned property comprised of approximately 17 acres be sold . . . .

Defendant appeals to this Court.

## Discussion

Although not stated exactly as such, Defendant raises three issues on appeal: 1) whether the Trial Court erred in refusing to find the Quit Claim Deed void for lack of capacity or undue influence or fraud; 2) whether the Trial Court erred in holding that the 17 Acre Parcel be partitioned by sale rather than divided in kind; and, 3) whether the Trial Court erred in prohibiting Defendant from using the common driveway.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first consider whether the Trial Court erred in refusing to find the Quit Claim Deed void for lack of capacity or undue influence or fraud. As this Court has explained:

> To be valid, a deed must be the result of the conscious, voluntary act of a grantor who has the capacity to transact business. *Cason v. Cason*, 116 Tenn. 173, 193–94, 93 S.W. 89, 94 (1905); *Fell v. Rambo*, 36 S.W.3d 837, 846 (Tenn. Ct. App. 2000). To have the capacity to transact business, a person need only be able to reasonably know and understand the nature, extent, character, and effect of the transaction. *Mays v. Prewett*, 98 Tenn. 474, 478, 40 S.W. 483, 484–85 (1897). However, a deed to a grantee who is in a confidential relationship with the grantor can be set aside if the grantee has exerted undue influence on the grantor to procure the deed. *Brown v. Weik*, 725 S.W.2d at 945.

*In re: Conservatorship of Groves*, 109 S.W.3d 317, 351 (Tenn. Ct. App. 2003).

With regard to confidential relationships, our Supreme Court has explained:

> In Tennessee, for example, where there is a "confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party, a presumption of undue influence arises, that may be rebutted only by clear and convincing evidence of the fairness of the transaction." *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995) (citations omitted). A confidential relationship is any relationship which gives one person dominion and control over another. *See Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989).
>
> The burden of proof regarding a confidential relationship rests upon the party claiming the existence of such a relationship. *See Brown v. Weik*, 725 S.W.2d 938, 945 (Tenn. Ct. App. 1983). Once a confidential relationship has been shown and a presumption of undue influence arises, the burden shifts to the dominant party to rebut the presumption by proving the fairness of the transaction by clear and convincing evidence. *Matlock v. Simpson*, 902 S.W.2d at 386; *see Gordon v. Thornton*, 584 S.W.2d 655, 658 (Tenn. Ct. App. 1979). To prove the fairness of the transaction, the dominant party may show that the weaker party received independent advice before engaging in the transaction that benefitted the dominant party. *See Hogan v. Cooper*, 619 S.W.2d 516, 519 (Tenn. 1981); *see also Richmond v. Christian*, 555 S.W.2d 105, 107–08 (Tenn. 1977) (proof that the donor received independent advice respecting the consequences and advisability of the gift) (citations omitted).

*Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002). Our Supreme Court in *Childress* cited to *Mitchell v. Smith* wherein this Court explained:

> Confidential relationships can assume a variety of forms, and thus the courts have been hesitant to define precisely what a confidential relationship is. *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn. Ct. App. 1974). In general terms, it is any relationship which gives one person dominion and control over another. *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977); *Turner v. Leathers*, 191 Tenn. 292, 298, 232 S.W.2d 269, 271 (1950); *Roberts v. Chase*, 25 Tenn. App. 636, 650, 166 S.W.2d 641, 650 (1942). It is not merely a relationship of mutual trust and confidence, but rather it is one
>
>> where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party.

*Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989) (quoting *Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973)). "A normal relationship between a mentally competent parent and an adult child is not per se a confidential relationship and it raises no presumption of invalidity of the transaction." *Bills v. Lindsay*, 909 S.W.2d 434, 440 (Tenn. Ct. App. 1993).

Although Defendant relies heavily upon the fact that Mother was hospitalized for psychiatric care in the 1960s to argue that Mother lacked capacity to execute the Quit Claim Deed, the evidence in the record on appeal shows that in 1994, when Mother executed the Quit Claim Deed, Mother lived alone, managed her own finances and paid her own bills, cooked and cleaned for herself, scheduled her own doctor's appointments, shopped for herself, and babysat her grandson. Additionally, Ms. Hale, who testified that she knew Mother well and that she spoke to Mother several times a week, described Mother as "sharp as a tack." Ms. Hale also testified that Mother had spoken with her about the deed to Plaintiff and the deed to Mother's grandson, and Ms. Hale believed that Mother understood what she was doing in executing those deeds.

As this Court explained in *In re: Conservatorship of Groves*:

> Capacity is not an abstract, all-or-nothing proposition. . . . Capacity is also situational and contextual, and it may even have a motivational component. It may be affected by many variables that constantly change

10

over time. These variables include external factors such as the time of day, place, social setting, and support from relatives, friends, and supportive agencies. It may also be affected by neurologic, psychiatric, or other medical conditions, such as poly-pharmacy, many of which are reversible with proper treatment. Finally, capacity is not necessarily static. It is fluid and can fluctuate from moment to moment. A change in surroundings may affect capacity, and a person's capacity may improve with treatment, training, greater exposure to a particular type of situation, or simply the passage of time.

*In re: Conservatorship of Groves*, 109 S.W.3d at 333-34 (footnotes omitted).

Defendant testified that Mother was hospitalized for psychiatric care when he and Plaintiff were children and that the last time this happened was in the 1960s. Plaintiff testified that Mother had stated that she had undergone electro-convulsive therapy. These facts, however, do not prove that Mother lacked capacity during that time period, and they certainly do not prove that Mother lacked the capacity to execute the Quit Claim Deed in 1994. The evidence in the record on appeal, as discussed above, does not preponderate against the Trial Court's finding that Mother was competent to execute the Quit Claim Deed.

With regard to Defendant's allegations of undue influence or fraud, the Trial Court found that there was no confidential relationship between Mother and Plaintiff that would give rise to a presumption of undue influence. The evidence in the record on appeal shows that while Plaintiff assisted Mother with some things, including transportation, Mother managed her own life. The evidence shows that Mother lived alone, managed her own finances and paid her own bills, cooked and cleaned for herself, scheduled her own doctor's appointments, shopped for herself, and babysat her grandson.

Furthermore, Plaintiff is not the only person who assisted Mother. Defendant testified that he also assisted Mother, and the evidence shows that there were other people who assisted Mother, specifically with regard to transportation because Mother did not drive. The evidence does not show that Mother relied on Plaintiff any more heavily than Mother relied upon others to assist her. Defendant himself testified that he picked up Mother's prescriptions for her, brought her breakfast "every other morning and [saw] what she needed at night . . . ," and sat up during the winter time to keep Mother's fire going.

The evidence in the record on appeal shows that the relationship between Mother and Plaintiff was a normal relationship between a mentally competent parent and an adult child. The evidence does not preponderate against the Trial Court's findings that no

confidential relationship existed between Mother and Plaintiff and that there was no undue influence as to Mother's execution of the Quit Claim Deed.

As for Defendant's allegation of fraud, Defendant argues in his brief on appeal that "[f]raud was directed against [Mother], e.g., she was told that if [Defendant] got divorced his wife would get the property, and was encouraged to believe that [Defendant] was financially irresponsible and would lose the property." The record on appeal, however, contains no evidence that even hints, let alone tends to prove, that the Quit Claim Deed was procured by fraud.

We next consider whether the Trial Court erred in holding that the 17 Acre Parcel be partitioned by sale rather than divided in kind. Pursuant to Tenn. Code Ann. § 29-27-201:

**29-27-201.  Sale for division authorized.**

Any person entitled to a partition of premises, under part 1 of this chapter, is equally entitled to have such premises sold for division, in the following cases:

(1) If the premises are so situated that partition thereof cannot be made;  or
(2) Where the premises are of such description that it would be manifestly for the advantage of the parties that the same should be sold instead of partitioned.

Tenn. Code Ann. § 29-27-201 (2012).

Our ability to address this issue raised by Defendant is severely hampered if not completely eliminated by the absence of either a transcript of the hearing with regard to this issue or a Tenn. R. App. P. 24(c) statement of the evidence. The Trial Court stated in its February 10, 2014 order that it had heard and considered "the testimony of witnesses," among other things when deciding this issue. Defendant, as the appellant in this case, had the duty "to prepare a record which conveys a fair, accurate and complete account of what transpired in the trial court with respect to the issues which form the basis of the appeal." *Nickas v. Capadalis*, 954 S.W.2d 735, 742 (Tenn. Ct. App. 1997) (quoting *State v. Boling*, 840 S.W.2d 944, 951 (Tenn. Crim. App. 1992)). "This court cannot review the facts de novo without an appellate record containing the facts, and therefore, we must assume that the record, had it been preserved, would have contained sufficient evidence to support the trial court's factual findings." *Sherrod v. Wix*, 849 S.W.2d 780, 783 (Tenn. Ct. App. 1992).

The Trial Court found that it would be manifestly for the advantage of the parties if the 17 Acre Parcel were sold unless specific conditions were met to address the fact that "the property constitutes an eyesore as a result of the dilapidated condition of the buildings and the substantial amount of trash, debris, refuse, and litter strewn about the said property." We must assume that the record, had it been preserved, would have contained evidence to support the Trial Court's finding. The Trial Court then found that there had not been substantial compliance with the stated conditions and "that offensive materials remain on the six (6) acre tract making the adjoining property virtually worthless . . . ." Again, we must assume that the record, had it been preserved, would have contained evidence to support the Trial Court's finding.

Furthermore, we note from the Trial Court's February 10, 2014 order that the parties stipulated "that if [Defendant] fails to abide by the conditions as herein set forth then the property shall be sold pursuant to [Plaintiff's] request." To enter into a stipulation in the trial court and then raise an issue on appeal alleging that the trial court erred in relying upon that stipulation, as Defendant is attempting to do here, is inappropriate and unacceptable, at best. Given all of the above, we find no error in the Trial Court's order holding that the 17 Acre Parcel be partitioned by sale rather than in kind.

Turning to Defendant's third issue regarding whether the Trial Court erred in prohibiting Defendant from using the common driveway, we note that just as was the situation with the previous issue discussed, the record on appeal contains no transcript or statement of the evidence with regard to this issue. Furthermore, we note that although Defendant argues in his brief on appeal that the Trial Court decided this issue without it being presented or litigated by the parties, Defendant himself raised an issue with regard to the driveway in his motion seeking a new trial and specifically asked the Trial Court to hear evidence with regard to the driveway. Thus, Defendant presented the issue to the Trial Court. Furthermore, as the record was not preserved, we are unable to determine whether the issue was or was not tried by consent of the parties. This Court can rely only upon the record on appeal properly before us. As we explained above, "we must assume that the record, had it been preserved, would have contained sufficient evidence to support the trial court's factual findings." *Sherrod*, 849 S.W.2d at 783. We, therefore, find no error in the Trial Court's order prohibiting Defendant from using the common driveway.[1]

---

[1] Additionally, as we have affirmed the Trial Court's order holding that the 17 Acre Parcel be partitioned by sale rather than in kind, any question as to Defendant's right to utilize the common driveway of the property is moot.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for further proceedings consistent with our opinion and for collection of the costs below. The costs on appeal are assessed against the appellant, B.F. Bunch, and his surety.

_____
D. MICHAEL SWINEY, JUDGE